UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ELEZA LYNN RODRIGUEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-CV-457 |
| | ) |
| OFFICER SWAGGER and | ) |
| QUALITY CORRECTIONAL | ) |
| CARE, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

This matter is before the Court on motions for summary judgment filed by Defendants. Motion for Summary Judgment by Defendant Quality Correctional Care, LLC ("QCC") (ECF No. 61); Defendant's Motion for Summary Judgment by Defendant Ashley Swager[1] (ECF No. 65). Plaintiff Eleza Lynn Rodriguez filed a response in opposition to the motions (ECF No. 71) and QCC and Swager filed reply briefs (ECF Nos. 71 and 72, respectively). For the reasons explained below, both motions are GRANTED.

**DISCUSSION**

Plaintiff Eleza Rodriguez, proceeding *pro se*, brought this action under 42 U.S.C. § 1983 in the Allen Superior Court on September 24, 2019. Complaint (ECF No. 4). Defendant QCC removed the case to this Court pursuant to 28 U.S.C. § 1446(b)(2)(A), with Defendant Swager's consent. Notice of Removal (ECF No. 1), p. 2, ¶ 6. Rodriguez alleges that the Defendants violated her constitutional right to adequate medical care while she was being held as a pretrial

---

[1] Plaintiff named "Officer Swagger" as a Defendant. The Defendant officer's name is Ashley Swager, not "Swagger" (*see* Swager Affidavit (ECF No. 65-1), and so the Court will use the proper spelling in this order.

detainee in the Allen County Jail from August 8, 2019, to August 13, 2019. *Id*. Rodriguez makes the following factual assertions:

> That on August 8, 2019 Rodriguez was arrested by the Allen County Police Department, in reference to visiting a common nuisance. As a pre-trial detainee, Rodriguez was then transferred to the Allen County Jail, for booking. Prior to being confined at the Allen County Jail, Rodriguez had a diabetic regimen of four (4) insulin shot a day, and one (1) daily dosage of thyroid medication. Upon being booked, Rodriguez was seen by an unknown, nursing staff, whom Rodriguez informed that she was a Type 1 diabetic, and suffering a thyroid condition. After the nurse check Rodriguez sugar levels, the results were a level 600. Thereafter, during Rodriguez confinement, she was only provided insulin once a day. That on August 10, 2019, Officer Swagger lockdown the cell block in reference to a Styrofoam cup being missing. While on lockdown, Rodriguez informed Swagger that she needed to go to nursing in order to address her diabetes condition, in which Swagger ignored. When Rodriguez condition began to worsen, she banged on her cell door in order to get attention for her medical needs. Swagger, did not notify the nursing staff and/or seek medical attention, however instead, places Rodriguez on a twenty four (24) hour in-cell lockdown. During this confinement, and around midnight, Rodriguez along with the entire cell-block started banging on the doors seeking medical attention for Rodriguez, whereas she suffered a panic attack. Upon officers coming to her attention, Rodriguez blood sugar level results were 64. Upon being release from confinement due to posting bond, Rodriguez immediately went to Parkview memorial hospital where she suffering the onset of a stroke for, her blood sugar level was 1100.

Complaint ECF No. 4), pp. 2-3 (all sic). Rodriguez alleges that the Defendants "violated Rodriguez['s] rights as guaranteed under the Fourteenth and/or Eight[h] Amendments[.]" *Id*., p. 4. Rodriguez sued Officer Swager seeking damages for Swager's alleged refusal to provide medical care. She sued Correctional Care alleging that "[i]t is the custom, pattern or practice of the defendants to violate an individual's rights in the manner set forth herein." *Id*., p. 2.

Defendant QCC moves for summary judgment arguing that "Plaintiff cannot set forth any fact evidence, opinion evidence, or witness testimony demonstrating that Defendant maintained an express policy, or had a widespread practice or custom that violated Plaintiff's Fourteenth

Amendment Rights. Therefore, this Court should grant summary judgment in Defendant's favor." Correctional Care Motion for Summary Judgment (ECF No. 61), p. 4. Defendant Officer Swager moves for summary judgment arguing that "[t]he undisputed evidence demonstrates that there are no genuine issues of material fact and Officer Swager is entitled judgment as a matter of law on all of the Plaintiff's claims." Swager Motion for Summary Judgment (ECF No. 65), p. 1.

**II. Standards of Review.**

**A. *Pro se* pleadings.**

This Court is mindful of the well-settled principle that, when interpreting a *pro se* petitioner's complaint, district courts have a "special responsibility" to construe such pleadings liberally. *Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996). "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). On the other hand, "a district court should not 'assume the role of advocate for the *pro se* litigant' and may 'not rewrite a petition to include claims that were never presented.'" *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) (quoting *Parker v. Champion,* 148 F.3d 1219, 1222 (10th Cir.1998), *cert. denied,* 525 U.S. 1151 (1999)).

**B. Motions for summary judgment.**

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc.*, 2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id*. (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Id*. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

### C. Deprivation of medical care to pretrial detainee.

It is undisputed that Rodriguez was a pretrial detainee when she was held in the Allen County Jail. As another district court has explained:

> The correct standard for pretrial detainees' medical-care claims under the Fourteenth Amendment is that of objective unreasonableness. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). The "deliberate indifference" standard cited by the Defendants is for convicted prisoners bringing claims under the Eighth Amendment, which prohibits "cruel and unusual punishments," or as the Supreme Court has interpreted it, the "unnecessary and wanton infliction of pain." *Id*. at 350 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). But pretrial detainees are not in the same boat as convicted prisoners serving their sentences. Because pretrial detainees "have not been convicted of anything, . . . they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them." *Id*. The distinction between convicted prisoners and presumed-innocent pretrial detainees was highlighted relatively recently by the Supreme Court.
>
> In *Kingsley v. Hendrickson*, the Supreme Court held that the correct standard to apply to the claims of pretrial detainees for excessive force under the Due Process Clause of the Fourteenth Amendment was whether the force used was objectively unreasonable. 576 U.S. 389, 396-97 (2015). Three years later, the Seventh Circuit concluded that the Supreme Court's reasoning also applied to pretrial detainees' medical-care claims. *Miranda*, 900 F.3d at 351-52. Applied here to Lamb's failure-to-intervene, Lamb must plausibly plead that the "defendants acted purposefully, knowingly, or perhaps even recklessly" in failing to intervene, and also that their actions were "objectively unreasonable." *Id*. at 353. Negligence alone still does not suffice under the Due Process Clause. *Id*.

*Lamb v. Cty. of Lake*, No. 1:20-CV-03592, 2021 WL 4306144, at *9 (N.D. Ill. Sept. 22, 2021); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."); *McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 884 (7th Cir. 2018) ("this court decided *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018), replacing deliberate indifference with a standard requiring a showing of objective reasonableness for a claim challenging the medical care provided to a pretrial detainee[.]"). As this Court recently explained, "[t]he objective reasonableness standard requires more than medical malpractice and 'the

5

state-of-mind-requirement for constitutional cases remains higher.'" *Dismukes v. Sanchez, et al.*, No. 3:21-CV-51, 2021 WL 5407324, at *1 (N.D. Ind. Nov. 18, 2021) (quoting *Miranda*, 900 F.3d at 353).

### III. Quality Correctional Care motion for summary judgment.

QCC argues that it is entitled to summary judgment for several reasons. First, QCC contends that "[b]ased on Plaintiff's deposition testimony, it is unclear if Plaintiff is attempting to hold Defendant responsible under a theory of *respondeat superior*. However, to the extent Plaintiff is, this would be improper and summary judgment must be granted in favor of Defendant." QCC Memorandum in Support (ECF No. 62), p. 10. QCC elaborates as follows:

> The doctrine of *respondeat superior* is not applicable to § 1983 actions; to be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right." *Childress v. Walker*, 787 F.3d 433, 437-438 (2015). "Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal citations omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation . . . A causal connection, of an affirmative link, between the misconduct complained of and the official sued is necessary.")). Plaintiff testified that she thinks that Defendant should be responsible for the actions of their employees. *See* Exhibit 1, at p. 74, lns. 14-17.
>
> However, Defendant cannot be held responsible in a §1983 action unless they personally participated in or caused the alleged constitutional deprivation. Plaintiff eludes to the fact that she may be upset with the fact that the doctor changed her medications and dosage amounts upon her entering the ACJ. However, no individuals like the doctor have been named in this suit. It would be improper to hold Defendant responsible for the alleged improper actions of this doctor who is not involved in this case. This is exactly what *Monell* [*v. Department of Social Services of New York*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] sought to avoid. As a result, Defendant must be dismissed from this case as a matter of law.

6

*Id.*, pp. 10-11. QCC, then, contends that it must be dismissed from this suit on summary judgment because it cannot be sued under § 1983.

Pursuant to *Monell*, Rodriguez can assert a claim against QCC only if the company had an express policy, custom or practice that resulted in a constitutional deprivation. QCC concedes that Rodriguez alludes to such a claim, but argues that it is based on speculation and conclusion:

> Q. Are you suing QCC because you believe that they have a policy that violated your constitutional rights?
>
> A. Yes.
>
> Q. What policy did they violate? What policy do they have that violated your rights?
>
> A. Well, first off, being told that the doctor there changed my medical and how he was going to give me my medicine. He didn't tell me or let me be aware of what he was doing to me. I basically wasn't aware of what my medical condition–like I knew what my medical was, like my disease and stuff, but you all are telling me that this doctor gave me a whole different regimen; that I didn't know about it. I didn't know any information about what medicine–how much medicine I was taking, what medicine I was taking. Because I wasn't even taking my insulin shots that I had with the name and everything on it. They were giving me clear vials with nothing on them. I didn't get to see any of that. I didn't get to see how much insulin I was taking. I didn't get to see my blood sugar meters when they took my blood sugars. And like I said, they didn't tell me about–I didn't know anything about whoever doctor that was changing how much insulin I take and how much insulin I was receiving.
>
> Q. So my question about the policy is: Are you aware of a particular policy? Are you aware of a policy that is X, Y, Z policy that violated your constitutional rights?
>
> A. I don't know the exact name for it. But I just know every hospital that I've been to or every hospital visit that I go to a patient has the right to know what's going on when a medical provider is treating them. And I didn't get that.
>
> Q. My question is: Have you seen a policy from QCC from the Allen County jail that says this or no?

> A. No.
>
> Q. Are you claiming that there is some sort of custom or habit that QCC has that violated your constitutional rights?
>
> A. Possibly.
>
> Q. Then tell me what it is?
>
> A. Well, I said earlier I heard you had said you had been on many cases like this before. So I want to say possibly this has happened to a lot of people.

Rodriguez Deposition, Defendant's Exhibit 1 (ECF No. 63-1), pp. 74-76. Rodriguez's testimony on this point is conclusory and speculative. As QCC contends, she cannot identify any policy or custom of QCC that caused her alleged injuries. Instead, she speculates that QCC may "possibly" have had such a policy or custom that may have affected "a lot people." But conclusions and speculation are insufficient grounds for a Fourteenth Amendment claim (and insufficient to survive summary judgment). As QCC summarizes it:

> Plaintiff believes that Defendant has a policy related to the physician changing her medication and how the medication is administrated. *Id*. at p. 74, lns. 18-24, p. 75, lns. 1-3. She believes this policy violated her constitutional rights. *Id*. . . . She is not aware of the policy name and has not seen the policy. *Id*. at p. 75, lns. 23-24; p. 76, lns. 1-11. . . . Plaintiff is not aware of any other pre-trial detainees that have had similar circumstances to what she is claiming. *Id*. at p. 77, lns. 6-9. . . . She is not aware of any patterns of conduct to show Defendant violated her constitutional rights. *Id*. at p. 77, lns. 6-14. . . . Plaintiff is not aware of any particular person associated with Defendant with active policy making authority that caused her alleged constitutional deprivation. *Id*. at p. 77, lns. 15-21.

QCC Memorandum in Support (ECF No. 62), pp. 4-5 (citing Rodriguez Deposition) (internal paragraph numbers omitted). In addition, QCC notes that it *did*, in fact, have a policy in place regarding inmate medical care, and that it followed that policy when providing Rodriguez with medical attention:

8

> Defendant has an express policy, J-E-02, which states that upon intake, detainees prescribed medications are reviewed and presented to the responsible physician for appropriate orders to continue/alter prescribed medications in a timely fashion. . . . When health-trained correctional personnel perform the receiving screening, they have documented training by the responsible physician or designee in early recognition of medical, dental, and mental health conditions requiring clinical attention and are trained to call health staff for disposition of the detainee, if problems are identified.

*Id*., p. 7 (citing Medical Care and Health Services, Indiana Jail Standards (ECF No. 31-1), p. 13).

QCC also insists that it followed that policy and provided Rodriguez with proper and adequate medical screening and treatment during her brief incarceration. Citing Plaintiff's medical records (from before and after her incarceration) and her deposition testimony, QCC explains as follows:

> On August 8, 2019, around 6 a.m., Plaintiff was arrested by the Allen County Police on charges of delinquency to a minor and visiting a common nuisance. *See* Exhibit 1, at p. 34-35. . . . Plaintiff arrived at the ACJ around 6:30 or 7:00 a.m. Id. at p. 38, lns. 14-16. . . . That afternoon, Plaintiff was seen by a nurse who asked her what medications she was on and what her health conditions were. *Id*. at p. 39, lns. 18-21. . . . A discussion was had with the nurse regarding Plaintiff's diabetes and her current diabetes medications. *Id*. at p. 40, lns. 22-24; p. 41, ln. 1. . . . Plaintiff remembers taking her blood sugar once on August 8, 2019. *Id*. at p. 41, lns. 6-9. . . . Plaintiff believes the following morning, August 9, 2019, she received short acting insulin. *Id*. at p. 43, lns. 17-20. . . . Plaintiff was not aware a doctor at the facility changed her insulin orders on intake. *Id*. at p. 44, lns. 5-7. . . . Plaintiff does not remember the exact times she received insulin while at the ACJ. *Id*. at p. 46-49. . . . Plaintiff remembers her blood sugar being checked while at the ACJ. *Id*. at p. 50, lns. 12-14. . . . She believes she received insulin ten or eleven times while she was in the jail. *Id*. at p. 49, lns. 18-20. . . . On August 13, 2019, around noon, Plaintiff made bail and left the ACJ. *Id*. at p. 55, lns. 13-15; p. 57, lns. 11-15.

*Id*., pp. 2-3 (internal paragraph numbers omitted). QCC also presents evidence detailing the medical care it provided to Rodriguez:

> On August 8, 2019, at approximately 1:55 p.m., prior to screening intake, Plaintiff began reporting nausea, headache, sweating, dry mouth, and increased thirst. See Plaintiff's Medical Records from Quality Correctional Care, attached hereto as Exhibit 2, at p. 18. . . . Plaintiff reported home blood sugar checks 6 times a day

9

> due to snacking. *Id*. Her blood sugar was checked and read high. *Id*. . . . Nurse Brown consulted Dr. TchapTchet about Plaintiff's condition. *Id*. Dr. TchapTchet then ordered regular insulin 18 units to be given immediately, with a sliding scale of long acting insulin 70/30. *Id*. Dr. TchapTchet then ordered routine long acting insulin 70/30, 15 units, three times a day, with regular (short acting insulin) on a sliding scale, three times a day with blood sugar checks three times a day. *Id*. . . . Plaintiff then received one order of regular (short acting insulin) and long acting 70/30 insulin. *Id*. . . . At approximately 3:50 p.m., medical intake screening was performed on Plaintiff by Nurse Brown. *Id*. at p. 1. . . . The nurse noted that Plaintiff was currently taking two prescribed [insulin] medications[.] *Id*. The nurse did not note any prescriptions for Plaintiff's thyroid. *Id*. . . . The nurse noted Plaintiff was currently under the care of her endocrinologist, Dr. Roust. *Id*. . . . Thereafter, Plaintiff began to receive regular blood glucose monitoring and insulin, as needed per doctor's orders of the sliding scale, depending on her blood glucose levels. *Id*. at p. 8-9, 20-24.

QCC Memorandum in Support (ECF No. 62), pp. 5-6 (internal paragraph numbers omitted).

QCC also argues that any alleged action or inaction on its part regarding Rodriguez's medical care was not the cause of her subsequent hospitalization. Citing again to Rodriguez's personal medical records and deposition testimony, QCC argues that her admission to Parkview Hospital the day after she was released on bail was caused by her own failure to manage her diabetes, not by any action or inaction on the part of QCC:

> On August 14, 2019, at 8:59 p.m., Plaintiff presented to Parkview Hospital in diabetic ketoacidosis ("DKA"). *Id*. at p. 56-59. . . . Both before and after this incident, Plaintiff has presented to the hospital in DKA. *Id*. at p. 60, lns. 6-8. . . . Plaintiff agrees with what her Parkview Hospital records says as she has used them as her medical provider her whole life. *Id*. at p. 62, lns. 4-10. . . . Plaintiff used to have trouble managing her diabetes. *Id*. at p. 62, lns. 18-20. . . . Plaintiff was admitted to Parkview on August 14, 2019, for DKA and discharged on August 16, 2019. *Id*. at p. 63, lns. 14-21. . . . A normal A1C value is under 7. *Id*. at p. 64, lns. 19-21. . . . An A1C value is a reflection of a person's average blood glucose levels over a three-month span. *Id*. at p. 66, lns. 20-24; p. 67, lns. 1-7. . . . At the time Plaintiff was admitted to Parkview on August 14, 2019, for DKA, she believes her A1C was about 14. *Id*. at p. 64, lns. 11-14. . . . At the time of the incident, Plaintiff was taking insulin but did not care enough to check her blood sugars or "stuff like that." *Id*. at p. 68, lns. 14-22. . . . Doctors always talked to Plaintiff about her sugars being poorly controlled. *Id*. at p. 68, lns. 6-9. . . .

10

> Thirteen days after being discharged from Parkview Hospital, Plaintiff presented back for hyperglycemia. *Id*. at p. 69, lns. 6-24, p. 70, lns. 1. . . . Thereafter, Plaintiff presented to Parkview Hospital for hypoglycemia and hyperglycemia in December of 2019, January of 2020, and February of 2020. *Id*. at p. 70-71. . . . At least four or five times prior to the incident, Plaintiff presented to the hospital for either hypo or hyperglycemia. *Id*. at p. 71, lns. 12-19.

QCC Memorandum in Support (ECF No. 62), pp. 3-4 (internal paragraph numbers omitted).

Based on these facts, including Rodriguez's medical records and her own admissions during her deposition, QCC maintains that Rodriguez presents no facts to support her Fourteenth Amendment claim against the company. The company argues that Rodriguez cannot sue QCC under § 1983 on a *respondeat superior* claim; that she presents no evidence that QCC had a policy or custom regarding medical care that resulted in a constitutional deprivation (and thus cannot bring a *Monell* claim against the company); and that any medical problems she suffered during or after her incarceration were *not* caused by any alleged action or inaction by QCC, but by her own failure to manage her serious health condition. Rodriguez does not dispute any of these factual assertions; she simply clings to her argument, which is that the medical care she received while incarcerated was inadequate. In other words, her claim against QCC is based on her subjective opinion that the medical care she was given for her diabetes was sub-par. This is insufficient to state a claim under the Fourteenth Amendment.

**IV. Officer Ashley Swager Motion for Summary Judgment.**

Defendant Swager argues that "the undisputed facts clearly demonstrate that Officer Swager was not deliberately indifferent to any serious medical condition and Ms. Rodriguez did not suffer any injury or deprivation during her incarceration in the Allen County Jail. Accordingly, Officer Swager is entitled to summary judgment as a matter of law on the

11

Plaintiff's claim." Swager Memorandum in Support (ECF No. 66), p. 2.

The primary reason she is entitled to summary judgment, according to Swager, is because she did not provide or even assist in providing any medical care to Rodriguez. Swager states in an affidavit as follows:

> On August 10, 2019, I was assigned to work B Shift in the Allen County Jail from 2:00 p.m. through 10:00 p.m. . . . As a Confinement Officer, I will at times assist with security and oversight of inmates during evaluations by medical staff, but I do not directly participate in the administration of any prescription medications, insulin, or provide other medical care or services to an inmate unless an exigent circumstance requires care such as CPR or other lifesaving measures. . . . On August 10, 2019, I did not administer any medical care or treatment to Eleza Rodriguez or any other inmate in the Allen County Jail. I am aware of no medical incident or emergency by Ms. Rodriguez in the Allen County Jail on August 10, 2019, that required emergency medical care or other specific evaluation that was not provided by staff.

Swager Motion for Summary Judgment, Exhibit 1, Affidavit of Officer Ashley Swager (ECF No. 65-1). Swager acknowledged in her affidavit that on August 10, 2019, she placed Rodriguez on a 24-hour lock down as a result of Rodriguez's "misconduct" (said misconduct being that Rodriguez was "kicking her cell door"). However, Swager also states she "had no further interactions with Ms. Rodriguez on August 10, 2019." *Id.*, p. 3.

Swager also presents an affidavit from a second Confinement Officer, Melanie Dager, who was also on duty on August 10, 2019, and who states as follows:

> During my shift at approximately 10:32 p.m. (22:32), I was assigned to conduct a clock run to inspect the cellblocks in the Allen County Jail and entered Z Block. . . . After entering Z Block, I looked into the first cell and was told by an inmate that an individual was having a seizure. I arrived at cell Z-3515 and discovered Plaintiff Eleza Lynn Rodriguez . . . laying [sic] on her mat on the floor crying. . . . I called for nursing assistance on the radio and advised of a possible seizure and stayed in the cellblock area until nursing staff arrived a few minutes later. . . . Ms. Rodriguez was evaluated by nursing staff and was found to have normal vital signs and a normal blood sugar level. Ms. Rodriguez and the other inmates in Z-

12

3515 were rehoused in their cell and I left the cellblock without any further incident.

Affidavit of Officer Melanie Dager (ECF No. 65-2).

Swager also notes that Rodriguez's medical records indicate that her blood sugar levels were checked and she was given insulin several times during her incarceration, but Rodriguez testified that she did not remember any of that:

> Q. Then later that evening at 5:53 p.m., it shows that you had low blood sugars and your blood sugars were 58. Do you remember having low blood sugar on the night of August 9th?
>
> A. You said it was 58?
>
> Q. Yes.
>
> A. And they said they did what? I'm sorry.
>
> Q. They gave you some long-acting insulin and another short-acting insulin.
>
> A. No. That would have put me in the hospital.
>
> Q. So you don't remember that?
>
> A. No.
>
> Q. The following morning at 11:26 a.m., it shows that you received the 70-30 long-acting insulin and some short-acting insulin?
>
> A. No, I don't remember that.
>
> Q. That afternoon at 3:55 p.m., it shows that you received long-acting insulin and some short-acting insulin?
>
> A. No, I don't remember that.
>
> Q. At 10:35 a.m. on August 11th, it shows that you received some long-acting insulin and some short-acting insulin?
>
> A. No, no.

Q. Do you remember that?

A. No.

Q. At 4:03 p.m. on August 11th, it shows that your blood sugar was 123. Do you remember you blood sugar being 123 in the afternoon of August 11th?

A. No.

Q. And that you received some long-acting insulin and some short-acting insulin?

A. I was never able to view my numbers while I was in there. And no, I don't remember taking long-acting and short-acting insulin.

Q. The following morning, on August 12th, at 6:45 a.m., your blood sugar was 104. So you don't remember that because you didn't see the numbers?

A. Yeah. They never showed me the meter.

Q. And that morning it shows that you received some long-acting insulin and some short-acting insulin–

A. No.

Q. –do you remember that?

A. No.

Q. At 10:49 a.m., you again received some more insulin, some short-acting and long-acting. Do you remember that?

A. No.

Q. At 4:39, you again received some short-acting and long-acting insulin and your blood sugar was 139. Do you remember that?

A. No.

Q. On August 13th at 6:42 a.m., you received some short-acting and long-acting insulin. Do you remember that?

A. No.

> Q. And the last dosage that you received was at 10:52 a.m. on August 13th. You received some short-acting and long-acting and then you were–I think you bailed out, is that a fair statement?
>
> A. Yes. But no, I don't remember that.
>
> Q. How often do you remember your blood sugar being checked while you were in jail?
>
> A. I'm going to say while I was in jail I got my blood sugar I want to say five times out of the whole time of being there, six times the whole time being there. And then receiving insulin, I want to say I probably go it I want to say I probably got it about ten, eleven times while I had been there. I have never taken that many shots ever before in my life.

Swager Motion for Summary Judgment, Exhibit 3, Rodriguez Deposition (ECF No. 65-3).

The undisputed evidence shows that Rodriguez received a health screening when she was booked into the jail, and had her blood sugar monitored and received insulin injections several times during her five-day incarceration. As Swager states:

> For the purpose of this motion, the Defendant does not dispute that Ms. Rodriguez had a serious medical condition at the time of her incarceration in the Allen County Jail. As discussed more fully in Quality Correctional Care's Motion for Summary Judgment, Ms. Rodriguez has suffered from poorly controlled diabetes during her adult life, including incidents of diabetic ketoacidosis, drastically elevated A1C values, and several presentations to local hospitals. See generally Doc. #62, pp. 3-4. That said, there is no evidence that any action or inaction of Officer Swager exacerbated or aggravated Ms. Rodriguez's condition and there is no evidence of deliberate indifference on her part.
>
> While Ms. Rodriguez generally contends that Officer Swager somehow prevented her from obtaining appropriate medical care for her diabetic condition, there is no evidence that Officer Swager ignored her or otherwise caused any delay in obtaining treatment or evaluation from medical providers. The undisputed evidence demonstrates that medical providers were in Ms. Rodriguez's block on three occasions during Officer Swager's shift on August 10, 2019, as late as 9:20 p.m. See Exhibit 1-A, p. 2. Ms. Rodriguez could have sought evaluation or treatment from those providers at any time and was not prevented from doing so by Officer Swager. Similarly, there is no evidence that Ms. Rodriguez's diabetic condition was ignored while she was housed in the Allen County Jail. As

> discussed above, Ms. Rodriguez concedes that her blood sugar levels were evaluated often during her incarceration and that she received medications for her condition.

Swager Memorandum in Support (ECF No. 66), pp. 6-7. Swager concludes her argument by stating as follows:

> While Ms. Rodriguez's Complaint suggests that she takes issue with the medical care she received during her incarceration, her critiques do not give rise to a claim as it is well-established that an inmate "is not entitled to unqualified access to healthcare." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). An inmate "cannot demand specific care and is not entitled to the best possible care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Regardless, Officer Swager did not participate in the medical evaluation or treatment received by Ms. Rodriguez during her incarceration and cannot be held liable on those grounds.

*Id.*, p. 8.[2]

In her response, Rodriguez argues as follows:

> I, Eleza Rodriguez would like to object to the summary judgment motion filed by Swagger and QCC or being punished for asking for help with my health conditions. Inmates in the jail treated Swagger horrible, called her names and yelled at her. I understand why the floor went on lock down, but I wouldn't have thought I would have to beg a police officers to help me get to a nurse I didn't feel right, having the top 5 deadliest disease I would have thought she would have helped me but she didn't instead I was told by Swagger to "figure it out." Then when I started to panic and beg harder she walked up to my cell door pointed at me and said 'you will be on lock down for 24 hours." After that, I did not see her again, that was about 8 pm, maybe 30 minutes went by my blood sugar was dropping and I didn't feel good I had threw up and had the whole floor banging on the doors to get someone to help me it was around 11 pm. When someone came to

---

[2] Swager mistakenly applies the Eighth Amendment deliberate indifference standard when discussing Rodriguez's claim. Swager Memorandum in Support (ECF No. 66), pp. 5-6; Swager Reply in Support (ECF No. ), pp. 3-5. Rodriguez, however, was a pretrial detainee, not a convicted prisoner, and so the Court applies the "objectively reasonable" standard established in *Kingsley* and *Miranda* to analyzing her claims. In fact, in an order entered on January 28, 2020, this Court dismissed Rodriguez's Eighth Amendment claims, concluding that since she was a pretrial detainee she could assert her claims only under the Fourteenth Amendment, pursuant to *Kingsley* and *Miranda*. Court Order (ECF No. 23). Therefore, the objectively reasonable standard is the proper standard of review for Rodriguez's claims.

>help me. I then come to find out after being released NO one in the jail contacted my doctors, they took it upon themselves to give me what they felt like giving me, I never got to see my blood sugars, I barely had my blood sugar checked. The medication didn't look like anything I used. I don't believe Ms. Swagger and QCC understands how it feels to put your life into someones hands and they fail you. If it wasn't for my mother and the inmates in jail, I probably would have had a seizure or even worse I could have died.

Rodriguez Response in Opposition (ECF No. 71), pp. 1-2.

The undisputed facts and evidence presented by the Defendants show that Rodriguez received medical care and treatment for her diabetes while she was incarcerated at the Allen County Jail (even though she professed not to remember that). She presents no facts to support her allegations that the medical care she received while in jail was objectively unreasonable. On the contrary, Rodriguez's response brief shows that her claims are based solely on her subjective belief that the medical treatment she received was inadequate and speculates that she "probably would have had a seizure or even worse I could have died."

It is undisputed that Rodriguez suffered from a serious health condition when she was arrested on August 8, 2019, and held in the Allen County Jail for five days. It is also undisputed that she received a health screening at the time she was processed into the jail and that she received treatment for that condition in the form of blood sugar checks and insulin injections. In sum, Rodriguez's entire case is based completely and only on her subjective belief that the care and treatment she received in jail *should have been* better or more thorough.[3]

In its reply brief, QCC reiterates its arguments that Rodriguez cannot sue QCC under § 1983 because it is not an individual and cannot be sued under a *respondeat superior* theory, and

---

[3] Rodriguez does not address the Defendants' argument, or dispute their evidence, that her admission to Parkview Hospital the day after she was released was caused by her own failure to manage her diabetes.

that Rodriguez presents no evidence that QCC had any policy, practice or custom in place that resulted in a constitutional violation (and, in fact, that the opposite is true). In Swager's reply brief, she summarizes Rodriguez's failure to establish a Fourteenth Amendment claim:

> Ms. Rodriguez's Response does not contain any reference to evidentiary material sufficient to satisfy the requirements of Fed. R. Civ. P. 56, but generally contends that the care she received in the Allen County Jail was somehow deficient. In essence, she argues she was "neglected." See Doc. #71, p. 2. As previously discussed in both Officer Swager's Motion for Summary Judgment . . . and QCC's Motion for Summary Judgment . . . , there is no dispute that Ms. Rodriguez received medical evaluation and care during her incarceration in the Allen County Jail. What Ms. Rodriguez seems to argue in her Response is that a greater level of care should have been provided to her, akin to an allegation of medical negligence. However, both the Supreme Court and the Seventh Circuit have been clear that evidence of medical negligence is not enough to prove deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); . . . Ms. Rodriguez's Response does not provide any evidence or support to her allegation that Officer Swager or any other individual was in any way deliberately indifferent to her medical needs at the Allen County Jail. There is no evidence that Officer Swager disregarded any substantial risk of harm at any time.

Swager Reply in Support (ECF No. 73), pp. 4-5.[4]

The Defendants are correct. Rodriguez presents no evidence that the medical care she received while in the Allen County Jail was "objectively unreasonable," (*Miranda*, 900 F.3d at

---

[4] Both QCC and Swager note in their reply briefs that Rodriguez's response to their motions is not in compliance with Rule 56 or Local Rule 56-1. The Defendants also note that even *pro se* litigants are required and expected to comply with applicable rules and that the Court may strike pleadings that are not in compliance. QCC Reply in Support (ECF No. 72), p. 1; Swager Reply in Support (ECF No. 73), p. 1. The Defendants are correct. However, as Swager notes, "courts also strongly prefer to resolve issues on the merits. *Schilling v. Walworth Cnty. Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986). While this Court has the discretion to strike Ms. Rodriguez's Response as untimely, the Court may proceed to evaluate the claim on its merits." Swager Reply, p. 2. Given the Court's conclusion that both Defendants are entitled to summary judgment, the matter of Rodriguez's noncompliance with Rule 56 or Local Rule 56-1 is moot.

353). As stated, her claims are founded solely on her subjective opinion that she received inadequate medical care. The undisputed evidence submitted by the Defendants, however, shows otherwise. Even after drawing all reasonable inferences in favor Rodriguez, there is no evidence to support her allegations that the care she received was objectively unreasonable. Accordingly, both Defendants are entitled to summary judgment on all of Rodriguez's claims.

## CONCLUSION

For the reasons set forth above, the motions for summary judgment filed by Defendant Quality Correctional Care, LLC (ECF No. 61), and Officer Ashley Swager (ECF No. 65) are GRANTED.

Date: November 29, 2021.

/s/ William C. Lee<br>
William C. Lee, Judge<br>
U.S. District Court<br>
Northern District of Indiana